UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OJMAR US, LLC,<br><br>        Plaintiff,<br><br>       v.<br><br>SECURITY PEOPLE, INC., et al.,<br><br>        Defendants. | Case No. 16-cv-04948-HSG<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION TO STRIKE PORTIONS OF DEFENDANTS' EXPERT REPORT**<br><br>Re: Dkt. Nos. 145, 146, 156 |

Pending before the Court are Security People, Inc. ("Digilock") and Asil Gokcebay's (collectively, "Defendants") motion for partial summary judgment on several claims asserted by Ojmar U.S., LLC ("Ojmar" or "Plaintiff") in its second amended complaint, Dkt. No. 146 ("Defs. Mot."); *see also* Dkt. No. 117 ("SAC"); Plaintiff's motion for partial summary judgment that U.S. Patent No. 5,337,043 is material prior art to U.S. Patent No. 6,655,180, Dkt. No. 145 ("Pl. Mot."); and Plaintiff's motion to strike portions of the expert report of Larry Nixon, Dkt. No. 156 ("Mot. to Strike"). Briefing on the motions is complete. *See* Dkt. Nos. 160 ("Pl. Opp."), 167 ("Defs. Reply"), 159 ("Defs. Opp."), 166 ("Pl. Reply"), 157 ("Opp. to Strike"), 158 ("Reply to Strike").[1] Having carefully considered the parties' arguments, the Court **DENIES** the motions.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

---

[1] This matter is appropriate for disposition without oral argument. *See* Civil L.R. 7-1(b).

1    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is evidence in the

2    record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The

3    Court views the inferences reasonably drawn from the materials in the record in the light most

4    favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

5    574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations,"

6    *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v.*

7    *Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

8         The moving party bears both the ultimate burden of persuasion and the initial burden of

9    producing those portions of the pleadings, discovery, and affidavits that show the absence of a

10   genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the

11   moving party will not bear the burden of proof on an issue at trial, it "must either produce

12   evidence negating an essential element of the nonmoving party's claim or defense or show that the

13   nonmoving party does not have enough evidence of an essential element to carry its ultimate

14   burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

15   (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must

16   also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at

17   325. In either case, the movant "may not require the nonmoving party to produce evidence

18   supporting its claim or defense simply by saying that the nonmoving party has no such evidence."

19   *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial

20   burden of production, the nonmoving party has no obligation to produce anything, even if the

21   nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

22        "If, however, a moving party carries its burden of production, the nonmoving party must

23   produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party

24   "must do more than simply show that there is some metaphysical doubt as to the material facts."

25   *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with

26   reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91

27   F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its

28   claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S.

at 323.

## II. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants move for summary judgment on Ojmar's federal antitrust claims, Cartwright Act claim, Lanham Act claim, tort claims, and Ojmar's request for attorneys' fees.[2] Disputes of material fact preclude summary judgment on each of these claims.

### A. Antitrust Claims

Defendants argue that Ojmar's alleged product market and submarket—electronic keypad locks with electronically actuated bolts ("EKLs")—are artificially narrow. *See* Defs. Mot. at 14. Defendants claim that there is no dispute that the proper product market and submarket extend beyond EKLs to include other types of shared use locks, including EKLs with manually actuated bolts, mechanical keypad locks, electronic non-keypad lock products, and hasps and cam locks. *See id.* at 16–17. Defendants accordingly contend that summary judgment on Ojmar's antitrust claims is proper.

Defendants are incorrect. To begin, Defendants need not move for summary judgment on Ojmar's alleged product market. In its order denying Defendants' second dismissal motion, the Court precluded Ojmar from proceeding on a product market consisting only of EKLs. *See* Dkt. No. 132 ("SAC Dismissal Order") at 3 (finding that Ojmar's "trait-focused allegations" "fail[ed] as a matter of law to demonstrate the absence of economic substitutability, the benchmark for a facially sustainable product market"). Nonetheless, the Court allowed Ojmar to advance its antitrust claims based on a properly alleged submarket. *See id.* at 4–5; Pl. Opp. at 10; Defs. Mot. at 17. Specifically, the Court held that Ojmar could premise a cognizable antitrust claim on an economically distinct EKL submarket (i.e., a "small part of the general market of substitutable products") within the broader market for locker locks. *See* SAC Dismissal Order at 4–5.; *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

---

[2] The Court set forth the relevant factual and legal background in its prior orders addressing Defendants' motions to dismiss Plaintiff's amended complaints. *See* Dkt. Nos. 132, 104. The Court incorporates those unchanged facts and the legal analysis from those orders here. In this order, the Court only discusses the facts and legal standards as necessary to address the issues raised by the parties' motions for partial summary judgment.

United States District Court
Northern District of California

1   For Ojmar's alleged submarket to survive summary judgment, Ojmar "must be able to

2 show that the alleged submarket is economically distinct from the general product market."

3 *Newcal Indus., Inc.*, 513 F.3d at 1045. Indicia of a valid submarket include: "industry or public

4 recognition of the submarket as a separate economic entity, the product's peculiar characteristics

5 and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price

6 changes, and specialized vendors." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).

7 Defendants argue that Ojmar fails to set forth evidence demonstrating that the EKL submarket is

8 economically significant or otherwise distinct from the broader locker lock market. *See id.*; Defs.

9 Mot. at 18.

10   The Court disagrees. There are genuine disputes of material fact underlying several of the

11 *Brown Shoe* factors. *See* 370 U.S. at 325. One such disagreement concerns what an EKL actually

12 is. *See id.* Defendants argue that EKLs include electronic locks with manual bolts, and that

13 electronic locks with manual bolts are indistinguishable from EKLs with electrically actuated

14 bolts. *See, e.g.*, Defs. Mot. at 10 ("The lock industry does not draw a boundary between manual

15 and motorized EKLs, let alone with other locks."). Ojmar, in contrast, claims that there is no such

16 thing as an EKL with a manual bolt. *See* Pl. Opp. at 11 n.8. Ojmar presents evidence that, when

17 all required inferences are made in its favor, supports that proposition. That evidence also

18 suggests that the bolt's look and function are economically significant because they implicate

19 purchasing decisions. *See* Dkt. No. 160-40 ("Lenzo Decl.") ¶ 22 (differentiating between EKLs

20 and locks with "an electronic keypad with a manual-cam locking device," and opining that the

21 latter "have less complex circuitry and require significantly less battery power because they do not

22 include an electrically actuated bolt or latch"); Dkt. No. 161-3 ("Wind Decl.") ¶ 4 (distinguishing

23 "electronic locks that are motorized or solenoid-actuated" from those "with an electronic keypad

24 but a manual lock"); Dkt. No 160-42 ("Oonk Decl.") ¶¶ 3–4, 6–12 (observing that certain

25 purchasers opt for EKLs because of the "premium image EKLs convey because they are fully

26 automatic"); Dkt. No. 161 ("Callaway Decl."), Ex. 3 at 74:23–75:19 (indicating that there are only

27 three competitors in the marketplace for an electronic lock for lockers with a motor-driven or

28 solenoid-driven locking mechanism). Thus, what lock technology comprises an EKL presents a

1    disputed factual issue for a jury to decide.

2            Making all inferences in Ojmar's favor, as required at this stage, the Court finds that a

3    reasonable jury could also find that EKLs occupy a distinct submarket based on unique and

4    economically significant characteristics. Ojmar sets forth facts showing that lock consumers

5    prefer EKLs to other lock types because EKLs can improve efficiency, reduce management costs,

6    enhance user convenience, augment security, provide a "premium image," and facilitate

7    compliance with the Americans with Disabilities Act ("ADA"). *See* Oonk Decl. ¶¶ 4–35 (listing

8    advantages to EKLs over conventional locks and electronic lock variations); Wind Decl. ¶¶ 4, 7,

9    12–14, 16 (detailing benefits relating to enhanced security, image, and ADA compliance); Lenzo

10   Decl. ¶¶ 54–56 (describing a combination of value-adding EKL features and functionalities); Dkt.

11   No. 160-6 ("Boullié Decl.") ¶¶ 7–12 (explaining design features that can enhance security).

12           Other *Brown Shoe* factors are similarly in dispute. There are, for instance, facts tending to

13   show that lock manufacturers recognize competition within a distinct EKL submarket. *See, e.g.*,

14   Wind Decl. ¶ 17 ("Zephyr Lock competes with Ojmar and Digilock in the market for electronic

15   keypad locks for lockers."); Callaway Decl., Ex. 3, 74:23–75:19 (stating that there are three

16   competitors in the EKL marketplace: Zephyr, Ojmar, and Digilock). One expert opines that EKLs

17   require distinct production facilities. *See* Boullié Decl. ¶¶ 15–19. There is evidence, if viewed

18   through a lens favorable to Ojmar, that could show that EKL pricing is distinct from and immune

19   to pricing of other lock types, including conventional locks, mechanical shared use locks, and

20   radio frequency identification (RFID) locks. *See* Boullié Decl. ¶ 20 (noting that EKL complexity

21   implicates costs); Oonk Decl. ¶¶ 5–12 (depicting features contributing to price premium), 32–33

22   (detailing price differences between EKLs, mechanical locks, and RFID locks), 36. Considering

23   these disputes of fact, summary judgment is inappropriate on Ojmar's federal antitrust claims.[3]

24

25   [3] Defendants object to the majority of the Wind, Oonk, Boullié, and Lenzo Declarations. *See*
     Defs. Reply at 5–6. Defendants' objections are often inaccurate. Contrary to Defendants'
26   suggestion, the Wind Declaration provides statements of fact, not legal conclusions. *See id.* at 5.
     To the extent that these declarations contain inadmissible hearsay statements, the Court does not
27   rely on those statements in reaching its decision. *See* Fed. R. Civ. P. 56(c)(4) (requiring that the
     declarations be made on personal knowledge; set out facts that would be admissible in evidence;
28   and show that the affiant or declarant is competent to testify on the matters stated); *Orr v. Bank of
     Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible

                                                    5

1    Separately, Defendants move for summary judgment on Ojmar's Cartwright Act claim.

2    *See* Cal. Bus. & Prof. Code § 16720. "In California, exclusive dealing arrangements are . . .

3    proscribed when it is probable that performance of the contract will foreclose competition in a

4    substantial share of the affected line of commerce." *Fisherman's Wharf Bay Cruise Corp. v. Sup.*

5    *Ct.*, 7 Cal. Rptr. 3d 628, 649 (2003) (quotation omitted). Defendants argue that Digilock's

6    conduct does not stifle competition in the alleged EKL submarket. *See* Defs. Mot. at 11–13, 19–

7    21. Specifically, Defendants contend that Ojmar has not lost market share because (1) Digilock's

8    agreements with original equipment manufacturers ("OEMs") are short term and terminable at

9    will; and (2) these agreements occupy just a small fraction of the marketplace. *See id.* Defendants

10   assert that these agreements can even promote competition. *See id.*

11   Disputed material facts preclude summary judgment on Ojmar's Cartwright claim. For

12   instance, Ojmar presents evidence which, when all required inferences are made in its favor, could

13   suggest that Digilock's OEM agreements were, in fact, coercive, and that OEMs could not

14   realistically terminate these agreements for financial reasons. *See* Wind Decl. ¶¶26–28

15   (describing how OEMs might lose market share as a result of declining Digilock's terms); Dkt.

16   No. 160-7 ("Day Decl."), Ex. A ¶¶ 9–10; Dkt. No. 144-22. There is also evidence, interpreted in

17   the light most favorable to Ojmar, that Defendants stifled competition by threatening to bring

18   patent infringement lawsuits against OEMs that used or displayed Ojmar EKLs. *See* Callaway

19   Decl., Exs. 23, 24, 25; Oonk Decl. ¶ 38, 40 (describing companies' refusals to display Ojmar locks

20   at subsequent industry trade shows); Lenzo Decl. ¶ 44. The Court does not, and need not, offer

21   any view as to whether Plaintiff's evidence is likely to be convincing to a jury at trial. At this

22   stage, it is enough to conclude that there are triable issues concerning whether and to what extent

23   Defendants' conduct hampered competition in the EKL submarket. *See id.*

24

25   evidence in ruling on a motion for summary judgment."). The Court likewise relies only on those
     non-speculative portions of the declarations that are based on the declarant's personal knowledge.

26   *See id.* Though Defendants object to the Boullié and Lenzo Declarations in their entirety,
     Defendants do not state why these declarations are inadmissible in sufficient detail. *See* Reply at

27   5–6. For instance, Defendants claim without a further showing that Defendants objected during
     discovery to Boullié being deposed outside of the Hague Convention. Defendants also assert,

28   without explanation, that Dr. Lenzo opines on subject matter outside his expert report. Given the
     absence of support, the Court declines to strike these declarations in full.

6

**B.    Lanham Act Claim and Tort Claims**

Defendants also move for summary judgment as to Ojmar's claims under the Lanham Act, 15 U.S.C. § 1125(a), and for various state law torts.  Turning first to the Lanham Act, that statute "proscribes misrepresentation of another's goods or services in commercial advertising or promotion."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (quotation omitted).  The elements of a Lanham Act false advertising claim are:

> (1) [A] false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers."  *Id.*

Defendants argue that Ojmar's Lanham Act claim fails as a matter of law because the relevant communications (1) do not constitute advertisements; (2) contain neither literally false nor misleading factual statements; and (3) did not harm Ojmar.  *See* Defs. Mot. at 21–23.  The allegedly unlawful communications comprise two sets of emails sent by Digilock employees to OEMs in 2014 and 2015, respectively.  *See id.* at 13–14; Pl. Opp. at 23–24.  The set of 2014 emails characterizes the function and performance of Ojmar EKLs.  *See* Defs. Mot. at 13–14.  The 2015 emails state that Digilock could sue OEMs for patent infringement if they displayed or promoted Ojmar locks.  *See id.* at 14.

Making all inferences in Ojmar's favor, there is a triable issue of fact as to whether the 2014 and 2015 emails constitute "commercial advertising or promotion" within the meaning of the Lanham Act.  "Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the

7

United States District Court
Northern District of California

1  protections of the Act." *Coastal Abstract Serv., Inc.*, 173 F.3d at 735 (citing *Seven–Up Co. v.*

2  *Coca–Cola Co.,* 86 F.3d 1379, 1383 (5th Cir. 1996)).  A genuine dispute of material fact exists as

3  to whether the 2014 emails portrayed the operation of Ojmar locks in a false or misleading

4  manner. *See* Callaway Decl., Ex. 16; Oonk Decl. ¶¶ 56–57; Boullié Decl. ¶¶ 21–24.  In addition,

5  viewing the evidence in the light most favorable to Ojmar at this stage, the Court finds that a jury

6  could find that there are facts underlying Ojmar's inequitable conduct claim (i.e., that Defendants

7  brought a patent infringement lawsuit against Ojmar in bad faith) that support Ojmar's Lanham

8  Act claim. *See* Callaway Decl., Exs. 9, 23, 24, 25; *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d

9  1340, 1353 (Fed. Cir. 1999) (holding that a patentee can be held liable under the Lanham Act

10  where the "marketplace activity in support of its patent" was undertaken in bad faith).  There is

11  sufficient evidence to create a triable issue as to whether these acts caused Ojmar to lose sales,

12  either directly or indirectly. *See id.*; Oonk Decl. ¶¶ 38, 40; Lenzo Decl. ¶¶ 29–34, 44.  Ojmar's

13  Lanham Act claim therefore survives at this stage.

14  Defendants frame Ojmar's tort claims as entirely derivative of Ojmar's antitrust and

15  Lanham Act claims. *See, e.g.*, Defs. Mot. at 23.  As set forth above, there are disputed factual

16  issues that preclude summary judgment on those claims.  Thus, summary judgment is likewise

17  improper on Ojmar's state law tort claims.

18      **C.    Attorneys' Fees**

19  Finally, Defendants argue that Ojmar's request for attorneys' fees cannot survive summary

20  judgment.  According to Defendants, Ojmar did not pay attorneys' fees related to this action. *See*

21  Defs. Mot. at 13.  But Ojmar represents that it paid attorneys' fees in connection with Defendants'

22  patent infringement lawsuits against Ojmar. *See* Callaway Decl., Ex. 43 at 29:7–19; Oonk Decl. ¶

23  44.  The Ninth Circuit has held that a party can collect attorneys' fees expended in defense of a

24  patent infringement claim if the infringement lawsuit was brought "in furtherance and as integral

25  part of a plan to violate the antitrust laws." *Rex Chainbelt Inc. v. Harco Prod., Inc.*, 512 F.2d 993,

26  1005–06 (9th Cir. 1975); *see Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084,

27  1088 (N.D. Cal. 2007) (finding that attorneys' fees from patent litigation can be awarded as

28  antitrust damages).  The cases that Defendants cite in response are neither binding nor persuasive.

8

1   *See* Defs. Mot. at 25.  Defendants fail to present any evidence to dispute Ojmar's attorneys' fees

2   claim.  Ojmar's request for attorneys' fees may therefore advance at this stage.

3   **III.    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

4          Ojmar moves for partial summary judgment on the ground that U.S. Patent No. 5,337,043

5   (the "'043 Patent") is "material prior art" to U.S. Patent No. 6,655,180 ("the '180 Patent").[4]  Pl.

6   Mot. at 1.  Both patents belong to Defendant Gokcebay.  *See id.*  Ojmar alleges that Defendants

7   committed "fraud on the PTO" by failing to disclose the '043 Patent in prosecution of the later-

8   issued '180 Patent, rendering the '180 Patent unenforceable.  *See id.*; *Walker Process Equip., Inc.*

9   *v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965) (holding that "enforcement of a patent

10  procured by fraud on the Patent Office may be violative" of the Sherman Act).

11         Ojmar's materiality argument is predicated on a 2016 decision by the Patent Trade and

12  Appeals Board ("PTAB"), in which the PTAB held that the '180 Patent was invalid based on

13  teachings from the prior art.  Specifically, the PTAB found that "claim 4 of the '180 patent would

14  have been obvious" based on U.S. Patent No. 4,917,022 ("the Ogasawara Patent") combined with

15  "either Gokcebay '043 or Lavelle."[5]  Callaway Decl., Ex. 3 at 2, 25–26, 29 (concluding that

16  "replacing the alternative mechanical key of Ogasawara with the alternative electronic access

17  mechanisms of the secondary references would have been well within the capabilities of a person

18  of ordinary skill and creativity").

19         In response, Defendants claim that the PTAB's invalidity decision does not establish, as a

20  matter of law, that the '043 Patent was material prior art to the '180 Patent.  According to

21  Defendants, the Court cannot determine materiality because the PTAB did not assess whether the

22  '043 Patent was cumulative of other prior art considered by the Patent and Trademark Office

23  ("PTO") examiner in her review of the '180 Patent.  *See* Defs. Opp. at 9.  Defendants argue that

24  the '043 Patent is cumulative of several other patents, including U.S. Patent Nos. 5,894,277 (the

25  "'277 Patent"), 5,886,644 (the "'644 Patent"), and 4,665,397 (the "Pinnow Patent"), upon which

26

27  ────────────────────
    [4] Ojmar does not move for summary judgment on the other element required to show patent fraud,
28  that Defendants acted with a specific intent to deceive the PTO.  *See* Pl. Mot. at 4–5.
    [5] "Lavelle" or the "Lavelle patent" is U.S. Patent No. 5,923,264.

9

*United States District Court*
*Northern District of California*

1    Defendants relied in their '180 Patent application.  *Id.* at 10.

2        There is no dispute that Defendants relied on the above-referenced patents in applying for

3    the '180 Patent.  *See id.* at 1, 5–7; Dkt. No. 159-1 ("Hainline Decl."), Ex. C at 9 (noting that "[t]he

4    following U.S. patents are believed to have some relevance to this invention: 5,886,644 and

5    5,894,277"), 11 (incorporating those patents by reference), 22 (remarking that the "invention also

6    encompasses the provision of the lock units" of the '644 and '277 Patents") 79–83 (stating the

7    examiner's review of teachings from the prior art).  Defendants also set forth undisputed facts

8    showing that the patent examiner considered these patents in examining the validity of the '180

9    Patent, and in particular the "key slot of claim 16."  *Id.* at 83; *see also* '180 Patent (58) (providing

10   the field of search "340/825.31"), '180 Patent (56) (citing prior art references).  The subject matter

11   of claim 16 was later incorporated into claim 26, which subsequently became claim 4 of the '180

12   Patent as issued.  *See* Defs. Opp. at 7; Hainline Decl., Ex. C at 7 ("Claim 26 essentially represents

13   the subject matter of original claim 20, with the addition of a key reader receptacle for receiving

14   contact of an identification circuitry device as an alternate means for accessing the lock.  This

15   feature was discussed above in relation to claim 24, as including most of . . . prior claim 16.").[6]

16   Defendants argue, and Plaintiff does not rebut, that claim 4 discloses an "electronic manager

17   bypass key and an electronic lock housing which can read the electronic manager bypass key."

18   *See* Defs. Opp. at 2.  Notably, it is the locking function that Ojmar contends the '043 Patent

19   teaches.

20       The relevant question before the Court is whether the materiality inquiry incorporates a

21   "cumulativeness" standard.  If it does, then summary judgment is inappropriate because there is a

22   genuine dispute as to whether the patents considered in the '180 Patent's examination were

23   cumulative of the '043 Patent.  *See Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309,

24   1319 (Fed. Cir. 2006) (noting that "the scope and content of prior art . . . are questions of fact").

25   In *Digital Control, Inc.*, the Federal Circuit held that materiality was not properly decided at

26

27   ───────────────────

28   [6] Upon this showing, the examiner issued a notice of allowability as to claims 20, 24, and 26.  *See*
     *id.* at 102 ("Applicant's arguments with respect to claims 24-26 are persuasive.  The prior art of
     record fails to teach the elements recited in claims 24-26.").

1    summary judgment due to disputes of fact pertaining to the prior art's teachings, including

2    whether one patent was cumulative of another. *Id.*

3         Ojmar argues that the Federal Circuit in *Therasense, Inc. v. Becton, Dickinson & Co.*

4    rejected that the materiality standard incorporates a cumulativeness component. *See* 649 F.3d

5    1276, 1291–92 (Fed. Cir. 2011); Pl. Reply at 2–5. Ojmar claims that *Therasense* "recognizes if a

6    prior art reference is used to invalidate a patent claim, that reference is **necessarily** material." Pl.

7    Reply at 4 (emphasis in original). In *Therasense*, the Federal Circuit held that a district court must

8    apply a "but-for" standard of materiality when assessing claims of inequitable conduct. *See* 649

9    F.3d at 1293–94 (defining the relevant inquiry as "whether the PTO would not have granted the

10   patent but for [the Patent Owner's] failure to disclose" relevant prior art). *Id.* In doing so, the

11   Federal Circuit rejected a "broad view of materiality" that relied on a "'reasonable examiner'

12   standard based on the PTO's 1977 amendment to Rule 56." *See id.* at 1293–94 (explaining that

13   the Federal Circuit was "not adopt[ing] the definition of materiality in PTO Rule 56" and was "not

14   bound by the definition of materiality in PTO rules"). Rule 56, in turn, integrates a

15   cumulativeness standard. The rule states:

> Information is material to patentability when it is not cumulative
> to information already of record or being made of record in the
> application, and (1) It establishes, by itself or in combination with
> other information, a prima facie case of unpatentability of a claim;
> or (2) It refutes, or is inconsistent with, a position the applicant takes
> in: (i) Opposing an argument of unpatentability relied on by the
> Office, or (ii) Asserting an argument of patentability.

20        Though this reading of *Therasense* could support Ojmar's view, a 2017 decision of the

21   Federal Circuit casts substantial doubt on Ojmar's position. *See Regeneron Pharm., Inc. v. Merus*

22   *N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017). In *Regeneron*, the Federal Circuit reiterated that

23   *Therasense*'s "but-for-materiality" test remains the governing standard for establishing an

24   inequitable conduct claim. *See id.* ("[A]s a general matter, the materiality required to establish

25   inequitable conduct is but-for materiality.") (quoting *Therasense*, 649 F.3d at 1291). But

26   *Regeneron* clarified that the question of cumulativeness still plays a role in the materiality

27   analysis. Relying on *Digital Control Inc.*, the *Regeneron* court stated that "[a] reference is not

28   but-for material, however, if it is merely cumulative." *Id.* (citing 437 F.3d at 1319). The court

11

1    explained: "A reference is cumulative when it 'teaches no more than what a reasonable examiner

2    would consider to be taught by the prior art already before the PTO.'" *Id.* (quoting *Regents of the*

3    *Univ. of Calif. v. Eli Lilly & Co.,* 119 F.3d 1559, 1575 (Fed. Cir. 1997)). Based on this principle,

4    the Federal Circuit concluded that that the district court had not clearly erred "in finding the

5    Withheld References but-for material and not cumulative of prior art that the PTO considered

6    during prosecution." *Id.* at 1352–53.

7          Despite affirmatively citing *Regeneron*, Ojmar ignores the Federal Circuit's discussion of

8    the cumulativeness inquiry. *See* Pl. Mot. at 4. Indeed, Ojmar takes the contrary stance, arguing

9    that cumulativeness plays no role whatsoever in the materiality analysis. *See id.* at 2–5 ("In view

10   of the controlling 'but-for' materiality standard of *Therasense*, there is no legal basis for

11   Defendants to argue that Ojmar is required to make an additional showing that the '043 Patent is

12   also not cumulative of the prior art cited during the '180 Patent's prosecution."). But *Regeneron*

13   belies that claim. Ojmar also fails to set forth evidence that the '043 Patent is not cumulative of

14   the prior art references that the patent examiner did consider, including the '277 Patent, the '644

15   Patent, and the Pinnow Patent. Only Defendants present evidence regarding the factual basis for

16   cumulativeness. *See* Defs. Opp. at 5–8 (comparing disclosures of the relevant patents).[7] And the

17   PTAB itself did not consider whether the '043 Patent was cumulative of prior art—instead, the

18   PTAB compared only the Ogasawara Patent, the Lavelle Patent, and the '043 Patent. *See id.* at 9.

19         In sum, the PTAB's decision does not, on its own, satisfy the "but-for" materiality standard

20   underlying Ojmar's inequitable conduct claim. Ojmar must therefore prove at trial that the '043

21   Patent was "but-for material" and "not cumulative of prior art that the PTO considered during

22   prosecution" of the '180 Patent. *See Regeneron Pharm., Inc.*, 864 F.2d at 1353–54.

23

24   _____

[7] Plaintiff argues that Defendants waived their cumulativeness argument by failing to raise it in
25   their initial answer to Plaintiff's inequitable conduct claim, or in their response to Ojmar's
     interrogatories. Pl. Reply at 3. But Defendants denied the basis of Ojmar's inequitable conduct
26   claim in their answer to the SAC in part by "alleg[ing] that Mr. Gokcebay and Mr. Freiburger
     were aware of Gokcebay patents that were not cited because they were not material prior art."
27   Dkt. No. 138-4 at 10. In addition, the case that Plaintiff relies upon for its waiver argument is
     distinguishable. *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1315 (Fed. Cir. 2008) (declining
28   to address on appeal whether prior art would have been cumulative because the party so asserted
     failed "to raise it before the district court").

## IV.     PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' EXPERT REPORT

Ojmar moves to strike one section of an expert report submitted by Defendants, containing testimony of Larry Nixon. *See* Mot. to Strike at 1; Reply to Strike at 1; Dkt. No. 151-1, Ex. B ("the Nixon Report"). Ojmar contends that Rule 26(a) precludes Defendants from submitting Section D of the Nixon Report, entitled "Rebuttal to the Ninth Count of Ojmar's First Amended Complaint and/or the Eighth Count of Ojmar's Second Amended Complaint." *See* Mot. to Strike at 1, 3. Ojmar claims that this section of the Nixon Report actually constitutes an opening report, not a rebuttal report, and that Defendants untimely disclosed the report. *See id.* Ojmar accordingly requests that the Court prohibit Defendants from relying on this section of the Nixon Report at trial. *See id.*

In response, Defendants argue that the Nixon Report was properly submitted as rebuttal expert testimony under Rule 26(a)(2)(D)(ii). Defendants claim that the Nixon Report responds to the report of Plaintiff's expert, Robert Taylor. *See* Opp. to Strike at 1; Dkt. No. 156-1, Ex. A ("the Taylor Report"). Defendants contend that, even if they disclosed the Nixon Report late, exclusion is too severe a sanction under the circumstances. According to Defendants, Ojmar was not prejudiced by that disclosure, and will have ample opportunity to respond prior to the parties' June 2018 trial date. *See* Opp. to Strike at 10–14.

The Court declines to strike Section D from the Nixon Report. Rule 26(a)(2)(D)(ii) allows a party to submit rebuttal expert testimony "on the same subject matter" as that discussed in the initial expert report. Section D of the Nixon Report pertains to subject matter on which Dr. Taylor opined, namely, the bases for Defendants' patent infringement lawsuits against Plaintiff. As stated in the Taylor Report, Taylor intended to "answer questions relating to [his] experiences in handling litigation for clients and in advising clients with respect to litigation issues, with particular reference to patent and antitrust matters." Taylor Report ¶ 3. Specifically, Taylor was asked to form an opinion "regarding the sufficiency of the factual and legal basis for initiating and continuing to prosecute" each of Defendants' patent infringement cases against Ojmar. *See id.* ¶ 5. Nixon, in turn, states that he is "prepared to offer at least the following assistance" at trial:

> [G]eneral background of relevant practice and procedure in the USPTO during the relevant period, especially focusing on a patent

13

1

2

3

4

> applicant's duty of candor and good faith; detailed explanation of relevant USPTO prosecution history events for U.S. Patent 6,655,180 (the "'180 patent"); rebuttal to the July 11, 2017 expert report of Robert P. Taylor; and rebuttal to the Ninth Count of Ojmar U.S., LLC's ("Ojmar" or "Plaintiff") First Amended Complaint and/or to the identical Eighth Count of Ojmar U.S., LLC's Second Amended Complaint.

5   Nixon Report at 3. Nixon provides opinions on each of these topics in the order described. *See id.*

6   3–30. While Plaintiff objects only to the last of these categories, labeled Section D, the content of

7   that section overlaps substantively with the opinions provided elsewhere by Nixon. The Court

8   therefore concludes that striking the opinions in this section of the report is not warranted.

9   Even assuming that Defendants improperly noticed this section of the Nixon Report,

10  Plaintiff has not been prejudiced by Defendants' disclosure. In *Yeti by Molly, Ltd. v. Deckers*

11  *Outdoor Corp.*, the Ninth Circuit discussed the scope of Rule 37(c)(1)'s exclusion sanction in the

12  context of a Rule 26(a) violation. *See* 259 F.3d 1101, 1106 (9th Cir. 2001) (explaining that Rule

13  37(c)(1) "gives teeth" to Rule 26(a)'s expert disclosure rules "by forbidding the use at trial of any

14  information required to be disclosed by Rule 26(a) that is not properly disclosed"). The Ninth

15  Circuit identified two "express exceptions" to "ameliorate the harshness of Rule 37(c)(1): The

16  information may be introduced if the parties' failure to disclose the required information is

17  substantially justified or harmless." *Id.* at 1107 (concluding that the district court did not abuse its

18  discretion in excluding the expert testimony, as the party moving to exclude the evidence would

19  be prejudiced by its admission). The Ninth Circuit has enumerated several factors that guide

20  district courts in this inquiry, including: "(1) prejudice or surprise to the party against whom the

21  evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of

22  disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the

23  evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010).[8]

24

25  [8] While it is not binding authority, the Court may rely on the Ninth Circuit's decision in *Lanard Toys* as persuasive authority. As other courts in this circuit have recognized, earlier published

26  decisions of the Ninth Circuit articulate a substantially similar five-factor test. *See Nihart v. Natl Park Serv.*, No. 2:12-CV-00291-APG, 2014 WL 1415198, at *1 n.10 (D. Nev. Apr. 10, 2014)

27  (concluding that the court's Rule 37(c)(1) analysis would be same under *Lanard Toys* as under prior binding authority, because those factors "ask substantially the same questions"). In *Payne v.*

28  *Exxon Corp.*, the Ninth Circuit articulated a balancing analysis including "the following five factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to

1    Considering these factors, the Court concludes that it would be harmless to deny the

2  motion to strike this section of the Nixon Report.  Plaintiff does not dispute that Defendants first

3  disclosed the information contained in Nixon's report four months prior to the Court's expert

4  discovery deadline.  *See* Opp. to Strike at 11.  Defendants did not rely on the Nixon Report in their

5  motion for summary judgment, or in opposing Plaintiff's summary judgment motion.  *See id.* at

6  13.  Plaintiff, moreover, agreed to depose Nixon in March 2018, and declined to depose him

7  earlier.  *See id.* at 1, 11; Dkt. No. 157-1 at 4, 8.  Given the timing of the disclosure, Ojmar's

8  participation in setting the case schedule, and the substantive overlap between Section D of the

9  Nixon Report and the report more broadly, Ojmar will face little, if any, prejudice if the Court

10 does not strike Section D.  *See* Dkt. No. 112; *cf. Yeti by Molly, Ltd.*, 259 F.3d at 1106 (finding that

11 the district court did not abuse its discretion by excluding an expert report improperly noticed one

12 month prior to trial); *Lanard Toys Ltd.*, 375 F. App'x at 713 (holding that a failure to comply with

13 Rule 26(a) was harmless where the non-moving party offering the report served a preliminary

14 expert declaration prior to the discovery deadline, produced a "supplemental" expert declaration

15 seven months before trial, and the moving party did not attempt to depose the expert).  The Court

16 therefore declines to strike Section D of the Nixon Report at this stage.

17 **V.    CONCLUSION**

18    For these reasons, the Court **DENIES** Defendants' motion for partial summary judgment,

19 **DENIES** Plaintiff's motion for partial summary judgment, and **DENIES** Plaintiff's motion to

20 strike portions of the expert report of Larry Nixon.

21    **IT IS SO ORDERED.**

22 Dated:   4/5/2018

23

24 HAYWOOD S. GILLIAM, JR.
   United States District Judge

25

26

27 manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring
disposition of cases on their merits; and (5) the availability of less drastic sanctions."  121 F.3d

28 503, 507 (9th Cir. 1997); *accord Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).  The
Court finds that it would reach the same outcome applying either test.